**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ISMAEL MOREIRA,

     Plaintiff,

  -against-

EXPERIAN INFORMATION SOLUTIONS,
INC.,

     Defendant.

Case No.: 1:23-cv-03442-JSR

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT
EXPERIAN INFORMATION
SOLUTIONS, INC'S MOTION TO
COMPEL ARBITRATION**

---

  Plaintiff Ismael Moreira ("Plaintiff" or "Mr. Moreira") submits this Memorandum of Law

in Opposition to Defendant Experian Information Solutions, Inc.'s ("Defendant" or "Experian")

Motion to Compel Arbitration and Stay This Action [doc. 17] ("Motion") and Memorandum of

Law in Support thereof [doc. 18] ("Memo").

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**.................................................................................................... **1**

**LEGAL STANDARD** ............................................................................................... **1**

**ARGUMENT** ........................................................................................................... **3**

    A.  The ECS Arbitration Agreement is Substantively Unconscionable Because it is
        Substantially One-Sided Such That Enforcement Would Lead to Oppressive and Unfair
        Surprise ................................................................................................................3

    B.  The Circumstances Surrounding Plaintiff's Agreement to the ECS Arbitration
        Agreement Were Procedurally Unconscionable ........................................................12

    C.  The Delegation Clause is Unconscionable Because It Is Unreasonably Overbroad ...15

**CONCLUSION** ...................................................................................................... **16**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aquino v. Alexander Capital, LP*,
  Case No. 21-cv-01355-JSR, 2023 U.S. Dist. LEXIS 57025, at *33-34 (S.D.N.Y. Mar. 31, 2023) .................................................................................................................................. 11

*Butnick v. Experian Info. Sols., Inc.*,
  Case No. 20-CV-01631-PKC-RLM, 2021 U.S. Dist. LEXIS 21926, at *21 (E.D.N.Y. Feb. 4, 2021) .................................................................................................................................. 11

*Christian v. Christian*,
  42 NY2d 63 (1977) ................................................................................................. 2, 4, 6

*Emigrant Mortgage Co. v. Fitzpatrick*,
  29 Misc. 3d 746, 753 (N.Y. Sup. Ct. 2010) ................................................................ 3

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938, 944 (1995) ............................................................................................ 2

*Gillman v. Chase Manhattan Bank, N.A.*,
  73 NY2d 1, 10 (1988) ............................................................................................ 2, 12

*Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enters.*,
  58 A.D.2d 482, 488, 396 N.Y.S.2d 427 (App. Div. 2nd Dept. 1977) ....................... 3

*King v. Fox*,
  7 NY3d 181, 191 (2006) .............................................................................................. 2

*Klein v. Experian Info. Sols., Inc.*,
  Case No. 19-CV-11156-PMH, 2020 U.S. Dist. LEXIS 201942, at *15 n.7 (S.D.N.Y. Oct. 29, 2020) .................................................................................................................................. 11

*Lease Fin. Grp. LLC v. Indries*,
  29 N.Y.S.3d 847 (N.Y. Civ. Ct. 2015) ...................................................................... 3

*Levy v. Credit Plus, Inc.*,
  Case No. 21-CV-05541-KMK, 2023 U.S. Dist. LEXIS 51952 (S.D.N.Y. Mar. 27, 2023) .... 1

*McFarlane v. Altice USA, Inc.*,
  524 F. Supp. 3d 264 (S.D.N.Y. 2021) ................................................................ 2, 10, 11

*Mehler v. Terminix Intern. Co. L.P.*,
  205 F.3d 44, 48 (2d Cir. 2000) ................................................................................... 1

*Mey v. DIRECTV, LLC*
  971 F.3d 284 (4th Cir. 2020) ............................................................................... 14, 15

*Nationstar Mortg., LLC v. West*,
    237 W. Va. 84, 89, 785 S.E.2d 634, 639 (2016) .................................................................. 14

*Norman Realty & Constr. Corp. v. 151 E. 170th Lender LLC*,
    74 Misc. 3d 1223 (N.Y. Sup. Ct. 2022) ............................................................................... 2

*Oliver v. First Century Bank, N.A*,
    Case No. 3:17-CV-00620-MMA-KSC, 2018 WL 1426877, at *3 (S.D. Cal. Mar. 22, 2018)..
    .......................................................................................................................................... 16

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63, 72-74 (2010) .............................................................................................. 16

*Revitch v. DIRECTV, LLC*,
    977 F.3d 713 (9th Cir. 2020) ........................................................................................ 7, 9

*Shalomayev v. Altice USA, Inc.*,
    Case No. 21-CV-05540-MKB, 2022 U.S. Dist. LEXIS 116144, at *27 (E.D.N.Y. June 30,
    2022) ................................................................................................................................. 10

*Simar Holding Corp. v. GSC*,
    87 A.D.3d at 690, 928 N.Y.S.2d 592 (App. Div. 2nd Dept. 2011) ......................................... 3

*State of New York v. Avco Financial Service of New York*,
    50 N.Y.2d 383, 389 (1980) ................................................................................................ 2

*Wexler v. AT&T Corp.*,
    211 F. Supp. 3d 500 (E.D.N.Y. 2016) ............................................................................... 10

*318 Rest. Workers Union v. Golden Bridge Rest*,
    2010 N.Y. Slip Op. 30992 (N.Y. Sup. Ct. 2010) ................................................. 4, 5, 6, 9, 11

## OTHER AUTHORITIES

Affiliate, Black's Law Dictionary 59 (7th ed. 1999) ...................................................................... 4

David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 652 (2020) .......................... 9

## I.     __INTRODUCTION__

This action is in front of the Court under the Fair Credit Reporting Act ("FCRA"). Mr. Moreira was the victim of inaccurate consumer reporting at the hands of Experian. Specifically, Experian had been reporting that Mr. Moreira was deceased for the better part of two years. *See generally* doc. 1. Accordingly, Plaintiff alleges claims against Experian under 15 U.S.C. §§ 1681e(b) and 1681i. *Id.* In its Motion and Memo, Experian argues that the dispute between Plaintiff and Experian should be compelled to arbitration based on an allegedly applicable arbitration agreement (the "ECS Arbitration Agreement[1]"). As detailed herein, the ECS Arbitration Agreement is both substantively and procedurally unconscionable. Therefore, the Court should deny Experian's Motion and allow Plaintiff to continue to litigate his claims against Experian in this Court.

## II.    __LEGAL STANDARD__

When there is a "[q]uestion[ ] of arbitrability," "courts in the Second Circuit generally 'follow a two-part test,' whereby they consider '(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement.'" *Levy v. Credit Plus, Inc.*, No. 21-CV-5541 (KMK), 2023 U.S. Dist. LEXIS 51952, at *12 (S.D.N.Y. Mar. 27, 2023) (quoting *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). However, "[p]arties to an arbitration agreement can. . . agree to arbitrate gateway questions of arbitrability." *Id*. at *21 (quotation omitted).

In evaluating arbitration agreements, federal district courts apply state-law contract principles. *See Mehler v. Terminix Intern. Co. L.P.*, 205 F.3d 44, 48 (2d Cir. 2000) ("in deciding

---

[1] For ease of reading, throughout this opposition memorandum, Plaintiff will refer to the allegedly applicable arbitration agreement at issue in Experian's motion as the "ECS Arbitration Agreement," however, Plaintiff asserts the modifier "allegedly applicable" in each instance.

whether the parties agreed to arbitrate a certain matter, courts should generally apply state-law principles that govern the formation of contracts") (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "Significantly, the FAA was intended to make arbitration agreements as enforceable as other contracts, *but not more so*." *McFarlane v. Altice USA, Inc*., 524 F. Supp. 3d 264, 274 (S.D.N.Y. 2021) (quotation omitted).

Under New York law "an unconscionable contract is voidable…" *Norman Realty & Constr. Corp. v. 151 E. 170th Lender LLC*, 74 Misc. 3d 1223 (N.Y. Sup. Ct. 2022) (citing *King v. Fox*, 7 NY3d 181, 191 [2006]; *Gillman v. Chase Manhattan Bank, N.A.*, 73 NY2d 1, 10 [1988]). "An unconscionable contract is one which 'is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms…'" *Norman Realty & Constr. Corp.*, 74 Misc. 3d 1223 (quoting *Gillman*, 73 NY2d at 10)). "Stated differently, an unconscionable bargain is one that 'no person in his or her senses and not under delusion would make on the one hand, and as no honest and fair person would accept on the other…'" *Norman Realty & Constr. Corp.*, 74 Misc. 3d 1223 (quoting *Christian v. Christian*, 42 NY2d 63, 71 [1977]).

"A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made…" (*Gillman*, 73 N.Y.2d at 10) involving "some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" (*State of New York v. Avco Financial Service of New York*, 50 N.Y.2d 383, 389 (1980)) (internal quotation marks omitted) (citation omitted).

"While determinations of unconscionability are ordinarily based on the court's conclusion that both the procedural and substantive components are present […], a provision of the contract

[may be] so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Lease Fin. Grp. LLC v. Indries*, 29 N.Y.S.3d 847 (N.Y. Civ. Ct. 2015)

Even where the Court determines that both must be present, "procedural and substantive unconscionability operate on a sliding scale; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa…" *Simar Holding Corp. v. GSC*, 87 A.D.3d at 690, 928 N.Y.S.2d 592 [internal quotation marks omitted].

"The determination of unconscionability is a matter of law for the court to decide…" *Industralease Automated & Scientific Equip. Corp. v. R.M.E. Enters.*, 58 A.D.2d 482, 488, 396 N.Y.S.2d 427.

## III.   <u>ARGUMENT</u>

### A.   The ECS Arbitration Agreement is Substantively Unconscionable Because it is Substantially One-Sided Such That Enforcement Would Lead to Oppressive and Unfair Surprise

The ECS Arbitration Agreement is substantively unconscionable under New York law. Due to frankly shocking overbreadth, the ECS Arbitration Agreement, as written, would require Plaintiff to arbitrate any conceivable claim he might have against an incalculable number of entities completely unknown to him at the time of the "agreement" between Plaintiff and a complete non-party to this action. Enforcement of the ECS Arbitration Agreement would lead to absurd, unreasonable, and unfair results. Accordingly, the Court should hold that the ECS Arbitration Agreement is substantively unconscionable and therefore unenforceable.

In New York, "[t]he substantive element of unconscionability entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Emigrant Mortgage Co. v. Fitzpatrick*, 29 Misc. 3d 746, 753 (N.Y. Sup. Ct. 2010). Substantive unconscionability may further be found where the

terms are "grossly unreasonable" (*318 Rest. Workers Union v. Golden Bridge Rest*, 2010 N.Y. Slip Op. 30992, 4 (N.Y. Sup. Ct. 2010)) or "where no [person] in his [or her] senses and not under delusion would [accept the terms]" and "the inequality [in the agreement is] so strong and manifest as to shock the conscience and confound the judgment of any [person] of common sense…" *Christian v. Christian*, 42 N.Y.2d 63, 71 (N.Y. 1977) (internal quotation marks omitted) (citations omitted).

In the case at hand, in or around May 2019, Plaintiff allegedly entered into an agreement with non-party CreditWorks, a credit **monitoring** service provided by Experian Consumer Services ("ECS"). To gain access to CreditWorks, Plaintiff was required to agree to a Terms of Use ("TOU") agreement. [Dkt. No. 19, ¶3] ("Williams Decl."). The TOU is a massively long, single-spaced, small-font webpage popup that includes the ECS Arbitration Agreement among its many provisions. [Dkt. Nos. 19-3, 19-4, 19-5]. By agreeing to the TOU, Experian contends that Plaintiff agreed to arbitrate every conceivable claim he may have at any point – whether sounding in tort, contract, fraud, or otherwise – against **any** affiliate of ECS, regardless of whether Plaintiff is aware of the affiliation, how remote the affiliation may be, or any other factor. While not defined by the TOU, "affiliate" is understood to mean "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Affiliate, Black's Law Dictionary 59 (7th ed. 1999).

Experian contends that it is an affiliate of ECS by sole virtue of the fact that both Experian and ECS have the same ultimate parent company, Experian plc. Williams Decl., ¶ 2. Experian plc is a multinational conglomerate boasting an ownership interest in dozens of entities in the United States, South America, Europe, and Africa. These entities operate across several different industries, including healthcare, technology, banking, and finance. If Experian's view is correct,

**any** company ultimately owned by Experian plc can compel Plaintiff to arbitration for **any** claim he may have at any point in the future. To demonstrate the perverse results which follow from this shocking overbreadth, a hypothetical is instructive. If Plaintiff were vacationing in Brazil and was hit by a car, only to learn that the vehicle which struck him happened to be owned by MOVA Sociedade de Empréstimo entre Pessoas S.A. ("MOVA") – an Experian-owned company located in Brazil[2] – MOVA could compel Plaintiff's personal injury suit to arbitration using the ECS Arbitration Agreement. Surely, this outcome is "grossly unreasonable" and not one that any consumer could **ever** reasonably foresee when agreeing to receive credit monitoring services. *318 Rest. Workers Union*, 2010 N.Y. Slip Op. 30992, at 4.

Beyond the absurdity of being forced into arbitration for unrelated claims with ECS' many affiliates, there are somehow even more problematic elements found in the ECS Arbitration Agreement. Specifically, the definitions incorporated into ECS Arbitration Agreement are broad enough that the number of parties who could potentially compel arbitration thereunder numbers in the **millions** – if not more. The full list of parties Experian contends can enforce the ECS Arbitration Agreement is as follows: "our respective parent entities, subsidiaries, affiliates (including, without limitation, our service providers), agents, **employees**, predecessors in interest, successors and assigns, websites of the foregoing, as well as **all authorized or unauthorized users or beneficiaries of Services and/or Websites or information** under this or prior Agreements between us relating to Services and/or Websites." [Dkt. No. 19-3, pg. 4] (emphasis added). An additional hypothetical is again instructive to show the absurd results which follow from the overbreadth of the ECS Arbitration Agreement. Suppose Plaintiff has a neighbor who

---

[2] Experian, Media, *Experian agrees to acquire majority stake in MOVA*, https://www.experianplc.com/media/latest-news/2022/experian-agrees-to-acquire-majority-stake-in-mova/ (last visited June 22, 2023).

happens to be employed by ECS. Now suppose Plaintiff and his neighbor have a dispute over where each party's property line ends. Again, Plaintiff's neighbor could compel this real property dispute to arbitration using the ECS Arbitration Agreement.

Furthermore, under the terms of the ECS Arbitration Agreement, apparently even **users** – meaning other customers – can enforce the ECS Arbitration Agreement, whether those users are "authorized or unauthorized." *Id*. Embracing Experian's view means Plaintiff is subject to arbitration under the ECS Arbitration Agreement with respect to **any** claim he has at any time against users of the "Services" and/or "Websites." *Id*. The term "Websites" is broadly defined to include "any affiliated website (including, but not limited to, Experian.com, FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, Creditchecktotal.com, CreditScore.com, usa.experian.com, and experian.experiandirect.com) ..." *Id*., pg. 2. Therefore, under Experian's view, a literal reading of the ECS Arbitration Agreement allows for enforcement by any customer of Experian – a nationwide credit bureau with tens of millions of customers. This scenario is nothing if not "grossly unreasonable." *318 Rest. Workers Union*, 2010 N.Y. Slip Op. 30992, at 4. As frankly stated by New York's highest court, "no [person] in his [or her] senses and not under delusion would [accept such terms]" as they would "shock the conscience and confound the judgment of any [person] of common sense…" *Christian*, 42 N.Y.2d at 71.

Surely, no consumer in existence would reasonably believe that by signing up for credit monitoring services, the consumer was agreeing to go to arbitration for a personal injury lawsuit in Brazil or for a real property dispute with the consumer's neighbor. Experian no doubt understands this, and rather than address the appalling overbreadth of the ECS Arbitration Agreement, Experian will likely argue: 1) Plaintiff's hypotheticals are absurd and thus should be ignored in favor of only looking at the facts of this case; and 2) the absurdities resulting from

6

Plaintiff's hypotheticals are easily resolved because the disputes are clearly not within the scope of the ECS Arbitration Agreement, and therefore not subject to arbitration.

With respect to the position that the "absurd" hypotheticals should not be considered when evaluating an arbitration agreement, the Ninth Circuit recently rejected this argument in *Revitch v. DIRECTV, LLC* (977 F.3d 713 (9th Cir. 2020)) when evaluating a Fourth Circuit opinion on a similar issue:

> …the majority [of the relevant Fourth Circuit panel] contends that in evaluating the soundness of [the defendant's] preferred interpretation of the arbitration clause, it would be inappropriate for a court to consider the "troubling hypothetical scenarios" to which such an interpretation could give rise. […] [O]ur consideration of hypotheticals […] very much does inform the question now before the court. […] [W]e employ hypotheticals to discern whether the mutual intent of the parties could have been to form an agreement to arbitrate any and all disputes that might ever arise between [the plaintiff] and yet-unknown affiliates such as [the defendant], no matter how unrelated to [the third party cousin-company's] provision of cellular phone service, including but not limited to the [federal consumer statutory] claim presented here.

*Id.,* at 720. The hypotheticals proposed by Plaintiff here are therefore informative and appropriate for consideration when analyzing the underlying question: Could Plaintiff have possibly foreseen the staggering breadth of Experian's interpretation of the ECS Arbitration Agreement at the time he signed up for CreditWorks?

With respect to any questions of scope, Experian will no doubt point to the "arising out of or relating to" language from the ECS Arbitration Agreement, and dismissively explain that personal injury and/or real property lawsuits clearly are not contemplated by the ECS Arbitration Agreement. This is precisely the problem, and a clear case of Experian wanting to have its cake and eat it too. As explained clearly in Experian's argument, "if there is any dispute as to the

arbitrability of Plaintiff's claims, an arbitrator is to resolve such issues." Memo, pg. 18.[3] The plaintiff would no doubt argue in the personal injury suit against MOVA discussed above – as Plaintiff intends to do here if compelled to arbitration – that his claim is not arbitrable under the ECS Arbitration Agreement. However, accepting Experian's position means that MOVA could successfully argue that an arbitrator would need to make the determination on whether Plaintiff's personal injury claim was arbitrable. Plaintiff would then be forced to wait months for an arbitrator to be assigned, petition for a threshold hearing on the question of arbitrability, and – if granted – could only proceed in court several months later.

Furthermore, any attempt by Experian to limit the Arbitration Agreement's scope by carving-out the more "absurd" scenarios would wade into the question of the Arbitration Agreement's proper scope and undermine Experian's contention, Memo, pg. 23, that only the arbitrator is to decide the question of scope. Put another way: Plaintiff contends that the Arbitration Agreement covers matters wholly unrelated to the Plaintiff's instant FCRA claims, to which Experian will no doubt aver that the Arbitration Agreement is ***broad enough*** to cover Plaintiff's claims, but is not ***so broad*** as to be analogues to the unenforced and/or unconscionable arbitration provisions that were present in *McFarlane* and *Wexler*.[4] In so doing, Experian will essentially be asking the Court to take passing, glancing notice of its Arbitration Agreement's not unlimited scope, but not so much notice that it starts to pay attention.

These hypotheticals serve to highlight the fact that the ECS Arbitration Agreement is undoubtedly substantively unconscionable on its face. However, Experian's attempt to enforce the ECS Arbitration Agreement in this utterly unrelated case is itself a prime example of why the ECS

---

[3] Plaintiff cites to Defendant's Memo via the page numbers stamped by the Clerk of the Court, rather than the numbers inserted in the Memo's footnotes.

[4] See *infra*, pp. 9-11.

Arbitration Agreement is "grossly unreasonable." *318 Rest. Workers Union*, 2010 N.Y. Slip Op. 30992, at 4. Plaintiff sought CreditWorks for the purpose of **monitoring** his credit report. He was not seeking consumer reporting services, nor could he seek such services from CreditWorks, as ECS does not offer any such services. The harms befallen Plaintiff leading to the immediate litigation are wholly unrelated to the credit monitoring services Plaintiff received from CreditWorks. Experian's motion is a transparent attempt to piggyback on Plaintiff's agreement with a separate entity which – purely by happenstance – is owned by the same ultimate parent company as Experian. The expectation that Plaintiff should arbitrate with Experian because of this happenstance is indeed "grossly unreasonable." *Id*. In short, the ECS Arbitration Agreement is of the kind that Professor Horton has gravely warned of:

> "Infinite arbitration clauses exhibit one or more of the following characteristics. First, they are 'not limited to disputes arising from or related to the transaction or contract at issue.' For instance, Wells Fargo's customers agree to arbitrate '[a]ny unresolved disagreement,' and Steiner's arbitration clause covers 'all disputes, claims or controversies whatsoever.' Thus, infinite provisions attempt to govern conduct that has nothing to do with the original transaction, such as sexual harassment after the purchase of household goods or 'a punch in the nose during a dispute over medical billing.' Second, infinite clauses extend beyond the original contractual partners. Like Mobility's Customer Agreement--which applies to the parties' 'subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users'--infinite clauses govern all persons or entities with a connection to the container contract. Third, infinite provisions have no sunset date. Although the common law condemns perpetual contracts, infinite clauses 'survive the closing of [an] account or termination of any service.' [...] **They are less a contractual provision and more a kind of arbitration servitude.**"

David Horton, ***Infinite Arbitration Clauses***, 168 U. Pa. L. Rev. 633, 652 (2020) (emphasis added).

This "infinite arbitration clauses" moniker and Professor Horton's 2020 publication by the same name were recently discussed in some detail by the Ninth Circuit. *See Revitch*, 977 F.3d 713. In affirming the lower court's denial of the motion to compel arbitration, the Ninth Circuit noted the limitless breadth of the arbitration "agreement" at issue would lead to "absurd results" including [the plaintiff being] forced to arbitrate any dispute with any corporate entity that happens

to be acquired by [defendant's parent company], even if neither the entity nor the dispute has anything to do with providing [the contractual] services to [plaintiff]…". *Id.*, at 717. The notion that Plaintiff's agreement to receive credit monitoring services – including agreement to the ECS Arbitration Agreement – included an agreement to arbitrate with millions of parties, the identities of whom are unknowable to Plaintiff, is just such an "absurd result[]". *Id.*

Multiple courts in the Second Circuit have, as well, been reluctant to enforce so-called infinite arbitration clauses. In *McFarlane v. Altice USA, Inc.*, the court refused to grant a defendant's motion to compel arbitration that was based on an agreement that,

> purport[ed] to cover "[a]ny and all disputes arising between" the customer and [the defendant, a cable company] — not to mention, [the defendant]'s parents, subsidiaries, affiliates, agents, successors, and so on — without meaningful exception and for all eternity. That is, it is "limited" only by the requirement that the dispute involve [the defendant] (or an associated entity or person), which, is, of course, no limit at all.

*McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021) (internal quotation omitted). The *McFarlane* court then embarked on a somewhat lengthy exposition that described the nature of the infinite arbitration clause, its relatively recent emergence, and how courts have dealt with them. After describing the two "paths" that courts have taken in choosing not to enforce infinite arbitration clauses, the court concluded that,

> it need not choose a single path because both ultimately lead to the same destination: a conclusion that, under New York law, the Arbitration Provision cannot be applied to claims lacking a nexus to the Altice cable service agreement. First, as a matter of contract formation, New York law, like Georgia law, provides that "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." . . . . In the alternative, and for similar reasons, the Court concludes that it would be unconscionable to enforce the Arbitration Provision with respect to claims untethered to the Altice cable service agreement.

*Id.* at 277. *See also*, *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016). Cf. *Shalomayev v. Altice USA, Inc.*, No. 21-CV-5540 (MKB), 2022 U.S. Dist. LEXIS 116144, at *27 (E.D.N.Y. June 30, 2022) (distinguishing *McFarlane* and *Wexler* and compelling arbitration where "Plaintiff

is a 'subscriber[] of [Defendant]' and . . . the claims have a nexus to the provision in the February 2020 Agreement."); *Butnick v. Experian Info. Sols., Inc.*, No. 20-CV-1631 (PKC) (RLM), 2021 U.S. Dist. LEXIS 21926, at *21 (E.D.N.Y. Feb. 4, 2021) (distinguishing *McFarlane* and *Wexler* and compelling arbitration where "the dispute arises from conduct related to the same credit card account Plaintiff opened when he entered the Cardmember Agreement"); *Klein v. Experian Info. Sols., Inc.*, No. 19-CV-11156 (PMH), 2020 U.S. Dist. LEXIS 201942, at *15 n.7 (S.D.N.Y. Oct. 29, 2020) (distinguishing *McFarlane* and *Wexler* and compelling arbitration where "[i]n contrast to these cases, the dispute [] arises from the conduct related to the credit card account [Plaintiff] opened when [s]he entered into h[er] . . . Cardmember Agreement" (citation omitted)).

    *See also*, *Aquino v. Alexander Capital, LP*, No. 21-cv-1355 (JSR), 2023 U.S. Dist. LEXIS 57025, at *33-34 (S.D.N.Y. Mar. 31, 2023) (Rakoff, J.) (while noting that "some courts have declined to enforce so-called 'infinite arbitration' agreements that purport to require arbitration of all potential past and future disputes between parties, even if those disputes are totally unconnected to the underlying agreement containing the arbitration clause," distinguishing *McFarlane* where "the claims governed by the settlement agreement between plaintiff and defendants clearly arise out of the same facts at issue in this litigation").

    The overbreadth of the ECS Arbitration Agreement further makes this provision "grossly unreasonable." *318 Rest. Workers Union*, 2010 N.Y. Slip Op. 30992, at 4. The only party to this case which could have conceivably known the identity of all who could apparently enforce the ECS Arbitration Agreement at the time of the "agreement" was Experian. Plaintiff had no way of knowing which – or how many – parties are considered "affiliates," "employees," or "authorized users" of the "Services" and/or "Websites" defined in the ECS Arbitration Agreement. It is difficult to imagine a more one-sided contractual provision than a provision which only one side

can conceivably or reasonably understand. Accordingly, the Court should intercede and hold that

the ECS Arbitration Agreement is substantively unconscionable.

###### B.    The Circumstances Surrounding Plaintiff's Agreement to the ECS Arbitration Agreement Were Procedurally Unconscionable

In New York,

> The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction […], whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power…

*Gillman*, 73 N.Y.2d at 10-11.

A review of the circumstances surrounding Plaintiff's alleged acceptance of the TOU fully

supports a finding that the ECS Arbitration Agreement is procedurally unconscionable. ECS is

allegedly an affiliate of Experian under the shared umbrella of a massive conglomerate with over

20,000 employees and annual revenues of over $5 billion. Plaintiff was required to agree to the

TOU, despite the fact that he was never required to view and/or read the TOU before making such

an agreement. *See* Williams Decl., ¶¶ 3-5. Moreover, there was no alternative to the ECS

Arbitration Agreement, and Plaintiff had no ability to bargain with ECS (or with Experian, whom

he had no possible way of knowing would attempt to force arbitration in a wholly unrelated lawsuit

arising under federal law). To that end, the TOU specifically states: "**IF YOU DO NOT AGREE**

**WITH ANY OF THESE TERMS OR CONDITIONS, DO NOT USE, ACCESS OR ORDER**

**ANY SERVICE OR ACCESS OR USE THE WEBSITES.**" [Dkt. No. 19-3, pg. 2]. In other

words, if Plaintiff wished to use the CreditWorks service, he had one option and one option only:

agree to the cumbersome TOU, including the "infinite" ECS Arbitration Agreement. In order to

understand the full extent of why these circumstances present such a problem for consumers, a broader view of the credit landscape is required.

In 2023, a consumer's credit score and credit history are more important than ever. Poor credit scores or derogatory marks in a consumer's credit history can cause a consumer to be denied a mortgage, an automobile loan, a rental application, an employment position, or even enrollment in a higher education institution. In short, the difference between a good and bad credit history can mean a dramatically better – or worse – life for a consumer. Consequently, it stands to reason that the vast majority of consumers know that they have a substantial interest in staying informed about their credit.

Consumers can retrieve their credit reports from Experian and the other two major credit bureaus – Experian's co-defendants Equifax Information Services, LLC ("Equifax") and Trans Union, LLC ("Trans Union") – for free from AnnualCreditReport.com ("ACR") once per year. However, the credit reports provided by ACR do not include a credit score, and furthermore leave the consumer unaware of the contents of their credit reports for the other 364 days each year. Therefore, most consumers seek out other free methods to stay up to date concerning their credit. One such avenue is the popular app CreditKarma, through which consumers can check their credit score and full credit report daily. However, CreditKarma provides credit scores and credit reports for **only** Equifax and Trans Union.

Experian's conspicuous absence from CreditKarma is, of course, deliberate. Instead, Experian pushes consumers toward its own "free" product – including through the use of aggressive marketing, complete with John Cena advertisements and a prominent national campaign – in order to accomplish dual goals. First, Experian is able to gather data on consumers, then turn around and sell that data for a profit. Second (more pertinent here), Experian ensures that

the consumer unknowingly bargains away her right to litigate and forever binds herself to arbitrate any conceivable claim she may have against Experian. It is unsurprising that there is no free service in existence through which a consumer can regularly check their Experian credit report without being forced to arbitrate all possible claims against Experian. For this reason, it becomes painfully clear that for consumers who want to be proactive concerning their credit – including their Experian credit report – the "option" of simply not using the CreditWorks website is at best Hobson's choice.

Moreover, the TOU states it may be unilaterally modified at any time. [Dkt. No. 19-3, pg. 3] ("AMENDMENTS"). Therefore, it is feasible that even if Plaintiff read each and every term of the TOU, he could be bound tomorrow to completely different terms. Given the sophistication of Experian as contrasted with Plaintiff – along with Experian's ability to modify the ECS Arbitration Agreement at any time, and unilaterally – it is evident that the circumstances surrounding the Arbitration Agreement fulfills the procedural unconscionability test in New York.

Furthermore, "infinite" arbitration clauses like the one found in the ECS Arbitration Agreement are contrary to public policy and may be deeply harmful to American jurisprudence. It is no secret that the lengthy contracts consumers regularly agree to in exchange for services like CreditWorks are often ignored by the consumer entirely, or otherwise go unread. However, "they trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated." *Nationstar Mortg., LLC v. West*, 237 W. Va. 84, 89, 785 S.E.2d 634, 639 (2016).

This issue was recently discussed by the Fourth Circuit in *Mey v. DIRECTV, LLC* (971 F.3d 284 (4th Cir. 2020)). Therein, Judge Harris – in his dissent later relied upon by the lower court on remand to find unconscionability and setting forth the basic holdings of the later Ninth

14

Circuit decision in *Revitch*, discussed above – eloquently stated "[n]o reasonable person procuring cell-phone service from AT&T Mobility and reading the attendant arbitration clause would understand 'affiliate' to include any and all future corporate cousins, as yet unidentifiable, and regardless of whether their relationship with AT&T Mobility would have anything to do with the provision of services under her cell-phone contract." *Mey*, 971 F.3d at 303 (Harris, J., dissenting).

It is worth noting that the arbitration clause in *Mey* – ultimately held to be unconscionably overbroad on remand – was **less overbroad** than the ECS Arbitration Agreement. The arbitration clause at issue in *Mey* did not include customers as parties who could enforce the arbitration clause, while the ECS Arbitration Agreement contains language allowing for exactly that. Surely, public policy cannot favor arbitration agreements that can be enforced by millions of unknown parties and for claims that have no relation whatsoever to the services under which the original arbitration agreement is entered. Agreements as overbroad as the ECS Arbitration Agreement are harmful and serve as nothing more than a deterrent for consumers to seek justice.

The circumstances surrounding Plaintiff's agreement to arbitrate matters with ECS were procedurally unconscionable. Plaintiff had no ability to bargain with ECS, and ECS represents the only free method through which Plaintiff can monitor his Experian credit score and credit report. ECS built in a contractual "right" to unilaterally amend the "agreement" at will, and the ECS Arbitration Agreement itself is an "infinite arbitration clause." Moreover, due to its shocking overbreadth, the ECS runs directly contrary to public policy interests. For these reasons, the Court should hold that the ECS Arbitration Agreement is procedurally unconscionable.

## C.   The Delegation Clause is Unconscionable Because It Is Unreasonably Overbroad

Plaintiff briefly discusses the delegation clause contained in the ECS Arbitration Agreement. In circumstances where a party seeks to avoid an arbitration clause containing a

delegation clause, the party must challenge both the overall arbitration agreement and the delegation provision. *See Oliver v. First Century Bank, N.A*, No. 3:17-CV-00620-MMA-KSC, 2018 WL 1426877, at *3 (S.D. Cal. Mar. 22, 2018) ("[T]he party seeking to avoid arbitration bears the burden of raising specific arbitrability challenges, including a challenge to the enforceability of a delegation clause.") (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72-74 (2010)). Here, the delegation clause found in the ECS Arbitration Agreement is unconscionable for the same reasons outlined above with respect to the ECS Arbitration Agreement as a whole. Specifically, the class of parties who can allegedly enforce the delegation clause are potentially innumerable, and their identities could not and cannot be known to any party to this suit other than Experian. Accordingly, the delegation clause should similarly be found to be both substantively and procedurally unconscionable, and therefore unenforceable.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Experian's Motion, and any other judgment the Court deems just and proper.


Dated: June 22, 2023,                         **CONSUMER ATTORNEYS**

                            By:     */s/ Levi Y. Eidelman*
                                Levi Y. Eidelman
                                300 Cadman Plaza West, 12th Floor, Suite 12040
                                Brooklyn, NY 11201
                                T: (718) 360-0763
                                F: (718) 715-1750
                                E: leidelman@consumerattorneys.com

                                *Attorneys for Plaintiff Ismael Moreira*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER ATTORNEYS**

By: *<u>/s/ Sierra M. Stewart</u>*
Sierra M. Stewart